8|10|20

COMMONWEALTH OF MASACHUSETTS
SUPERIOR COURT DEPARTMENT
PLYOUTH SUPERIOR COURT

PLYMOUTH, ss

Docket no 2083CV00583 B

FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

AUG 10 2020

MARIA SANTOS

PLAINTIFF

V.

Deutsche Bank National Trust Company, as Trustee for J.P. Morgan Mortgage Acquisition Trust 2007-CH5, Asset Backed Pass-Through Certificates, Series 2007-CH5, SELECT PORTFOLIO SERVICING LLC (SERVICER)

DEFENDANT

VERIFIED COMPLAINT

INTRODUCTION

COMPLAINT AGAINST Deutsche Bank National Trust Company, as Trustee for J.P. Morgan Mortgage Acquisition Trust 2007-CH5, Asset Backed Pass-Through Certificates, Series 2007-CH5, SELECT PORTFOLIO SERVICING LLC (SERVICER)AND CHASE BANK USA

BROKER FAILED TO PROVIDE PLAINTIFF WITH INFORMATION WHICH WOULD HAVE EXCLUDED HIM FROM MAKING MORTGAGE IN THE FIRST PLACE. VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT. IN THE ORIGINATION FOR SELLING A LOAN WHICH THE ENTITY MAKING THE LOAN KNEW OR

SHOULD HAVE KNOWN THAT THE PLAINTIFF COULD NOT AFFORD. IN THE LONG RUN

ORIGINATION FOR BASING MORTGAGE APPROVAL ON POSSIBLY STATED

VIOLATION OF FEDUCIARY DUTIES. VIOLATIONS OF FEDERAL AND STATE

THE FAILURE OF ANY ENTITY

ATTEMPTING TO ENFORCE THE OBLIGATIONS OF THE MORTGAGE TO PRODUCE A VALID NOTE TO JUSTIFY COLLECTION RIGHTS OR ANY RIGHT CITIZEN'S VIOLATED ITS DUTIES TO CORRECT THE MORTGAGE ISSUES PLAINTIFF APPLIED MANY TIMES FOR MODIFICATION.

THEY EITHER NEVER ACTED ON THE NUMEROUS APPPLICATIONS OR MISTAKENLY TURNED THE PLAINTIFF DOWN. AS THE ABOVE NAMED CASE STATES "INERTIA IS NOT AN OPTION" IN DEALING WITH THE REQUIREMENTS OF THE HAMP AND SINCE THE END OF HAMP THE MORTGAGEE LACKED LEGAL STANDING TO CARRY OUT ANY FORECLOSURE ACTION OR COLLECT AS THEY CANNOT PRODUCE THE ORIGINAL MORTGAGE NOTE TO JUSTFY COLLECTION AND FORECLOSURE RIGHTS; ALSO, THE DEFENDANTS DID NOT MARKET THE PROPERTY OR IN ANY WAY ATTEMPT TO PROTECT THE EQUITY OR AS A TRUSTEE FOR THE BENEFIT OF THE HOMEOWNER. H

SHE WAS SOLD THE ADJUSTABLE RATE MORTGAGE ON A TAKE IT OR LEAVE IT BASIS. . FAILURE UNDER MASACHUSETTS LAW TO DISCLOSE TO A BUY FACTS THAT WHICH MAY HAVE INFLUENCED THE BUYER NOT TO ENTER INTO THE TRANSACTION. POSSIBLE FALSIFICATION OF INCOME INFORMATION ON THE APPLICATION.

PARTIES

1. Maria R. Santos, the Plaintiff, resides at 122 Battles Street, Brockton, MA 02301.

2. . Defendant, Deutsche Bank National Trust Company, resides at 300 SOUTH GRAND AVENUE LOS ANGELES, CALIFORNIA 90071

3. Defendant, Select Portfolio Servicing Inc,, resides at PO Box 65250. Salt Lake City, UT 84165-0250

. BACKGROUND

4. .Maria Santos, brings this suit, as a Massachusetts plaintiff, to challenge the Defendants for improperly selling a mortgage that they had rrason to know was not in the Plaintiff's bes interest. Defendant knew or had reason to know that the Plaintiff could not afford. The Plaintiff was sold an adjustable rate mortgage sold by slick marketing techniques. It was also a stated income loan to the best of the Plaintiff's recollection.

5. In essence the broker, gave the Plaintiff a mortgage he knew or had reason to know that he (Plaintiff) could not afford. The Plaintiff was misled at every stage of the process, through slick marketing techniques and fast procedures that really did not afford him the opportunity to question.

6. In 2007 the Plaintiff was solicited by Chase to take out an adjustable rate mortgage based upon stated income for $336,000. The years could increase to 14.75% interest rate started at 7.75% and at six month intervals after 2 years could increase to 14.75%

7. The mortgage clearly was not in the Plaintiff's interest. She was told that it was the best that could be done and was sold it on a take it or leave it basis. She was assured that after 2 years it could be refinanced, and she could avoid the rate increases.

8. The stated income application did not contain accurate income information and may have been falsified.

9. The Plaintiff signed what borrower was told was a legal mortgage on 3/7/2007 The Plaintiff did not have legal counsel at the closing.

10. The Plaintiff did not receive the closing documents for review before the closing and was rushed through the signing.

11. The terms of these loans were never explained to the Plaintiff.

12. Mortgage had subprime characteristics not marked off or represented in check off boxes in the mortgage itself.

15. In February 2012, Chase supposedly sent a Default/Right to Cure letter.

16. Mass General Laws Chapter 244, Section 35a, the "Right to Cure" law was passed in 2007, and became effective May 1st of 2008. It requires all default letters dated after May 1st of 2008, to properly identify the mortgage-holder on the date of the letter, provide specific information additional to the previously standard default letters, and at the end of the 90 day Right to Cure period, file a copy of the

"Right to Cure" letter and an affidavit swearing to compliance with the law concurrent with the lender's filing in Land Court their Active Military Service filing.

17. In August of 2010, the Right to Cure statute was amended to make the Right to Cure 150 days and change the resource agencies required to be listed in the Right to Cure letter.

18. The statutory power of sale used refers to the mortgage section that is used to authorize a foreclosure auction of the property states that a valid auction of the property must comply with the power as sale as defined in the mortgage and "statutes relating to foreclosure" in Massachusetts.

19. On February 2012, Chase purportedly sent a right to cure letter to Plaintiff..

20. The letter did/did not explicitly tell the Plaintiff that they had a right to reinstate after acceleration and the right to bring a court case to raise defends to the default and the foreclosure.

Some of the Plaintiff's other claims are also simple- when financial institution accepts an application to modify a loan to prevent a foreclosure, under the governmental and private lender investors for modification, the lender must treat the application in a non-negligent manner. Foreclosure activity must stop and the lender must follow through and meet the strict deadlines to make a determination. Inertia is not an option. When a modification is offered is must be in the Plaintiff's best interest and must at least attempt to resolve long standing issues.

21. Chase and Deutsche and others have entered into written agreements for applications for modifications. The Plaintiff, for her part, many times applied for modification over the years. After many years of syn around Plaintiff was given a modification in 2016. The modification had the balloon payment of over $170,000 and did not cure the wrongs of the original mortgage and was not based upon the Plaintiff's ability to repay.

22. As a result, the Plaintiff- are deprived of the opportunity to keep her home and cure any delinquencies. The actions of the Defendants thwart the purposes of the HAMP program and are Im[roper under Massachusetts law.

23. Under Massachusetts Uniform Commercial Code section 2-301, unless the claimant can produce the original note, properly assigned, he (or the claimant) has no collection rights and cannot foreclose. As of this date Chase and no other company has not produced the document.

24. The HAMP modification process (and private investor) consists of two stages,

: (1) The servicer is required to gather together all the required

financial information; and, offer the homeowner possible modification.

. The Plaintiff fulfilled all of the documentation and payment requirements. And, as a second stage was put on permanent hold and never told anything about an adjustable rate mortgage. Basically, he was sold the idea of taking out the adjustable rate, so he could benefit from

31. The mortgage was a stated loan. There is no way of knowing if false numbers were used. But, given the unfair nature of the loan, it would be easy to show that was the case.

32. Defendants then used this application to close the loans you knew he would not be able to afford even with second mortgage. Under the Massachusetts Predatory Lending Home Loans Practices Act,by providing high-cost loans without a reasonable belief in the ability to repay The points and fees of this loan should have been amortized over the actual short term to correctly calculate the annual percentage.

33. The Plaintiff had continuously tried to contact the defendant in an effort to resolve these and other issues.

34. Clearly, this was part of a scheme to secure high financial return for the Defendant at the expense of the plaintiff. The Defendant did not care about the Plaintiff's financial well-being at all. Instead, he worked out a little scheme to actually misuse the new mortgages. The Plaintiff tried not have to figure out a gimmick to get a mortgage could afford. Instead, the Plaintiff was shown contempt by the Defendant, when at every stage of the process he was over charged, denied escrow verification and talked into taking a very bad mortgage, to say the least-, all because the bank saw dollar signs in providing the Plaintiff with this monstrosity of a series of mortgages. This effectively sent the Plaintiff into a several years campaign to attempt to secure stability in a very unstable series of circumstances. As stated before the Plaintiff even had to file Bankruptcy on more than one occasion. Clearly, this was not contemplated when he took out the mortgage.Instead, he was misled into thinking he was getting something that he actually was not getting.

35. The Plaintiff was told that she could modify or refinance the loan.

to help him modify or refinance her mortgage over the next few years. After considerable effort on the plaintiff's part and numerous applications under HAMP and after many years was finally modified The modification had a balloon payment of over $170,000 .

36. The Plaintiff was totally manipulated. He was misled at every stage of the refinance process. He was put in a position where she could not afford the new mortgage at all. The mortgage changed hands so often that he did not know which way to turn.

37. She was forced to file Bankruptcy on multiple occasions to halt foreclosures.

38. This on top of everything else hurts the ability of the plaintiff to cure his problems The client has had a series of problems with the Defendants, none of which has been resolved.

39. . As alluded to before the brokers and mortgagees falsified the information on the loan application. As a result they gave the Plaintiff loans they had reason to knows he could not repay.

COUNT ONE

VIOLATIONS OF MASSACHUSETTS AND ATTORNEY GENERAL REGULATIONS 940 CMR SECTIONS 7 AND 8

40. The mortgage with Defendants represents an unfair mortgage due to the fact that the above-named derelictions were performed on points, More importantly, it was based on stated income documents, is a clear violation of the law. This faulty mortgage also had an unreasonably high interest rate and monthly payment and was adjustable rate.

The mortgage clearly falls into these factors and is an unfair and deceptive act under Massachusetts Law. In fact more than one of these areas applies under Massachusetts General Law Chapter 93-A, section 2, this is an unfair and deceptive act.

41. The Predatory Loan Claim:

The plaintiff was not aware of it at the time but the mortgage was unconscionable. It was based upon unequal bargaining, with surprise. As indicated in the original facts, the Plaintiff was not experienced in real estate matters when he took out this loan (other than his own home).

The loan was sold in a way that the Plaintiff was led to believe that the mortgage would be low cost until he could refinance again. She was rushed through the process without a lawyer present. No documents were required for the procurement of the loan.

42. Furthermore; In spite of the fact that It is clear that Fremont v. Commonwealth and Drakopoulos v. U.S. Bank National Association, the Court did not wish to limit the concept of structurally unfair mortgages to the 4 factors delineated. But, that other mortgages would qualify. Surely the above-named mortgages were not only unfair they were also unconscionable. Interest rate is not the only analysis. This does not encompass all possible Fremont and Darkopolous issues. Also, MGL 183 (c) is not all encompassing in its analysis of structurally unfair mortgages

In Drakopoulos v. U.S. Bank National Association, 465 Mass. 775, quoting other cases like

43. Fremont Home Loans, the Massachusetts court clearly indicates:

"Concluding that the plaintiffs' loan did not qualify as a high cost home mortgage loan, the judge allowed the defendants' motion with respect to the act, a decision that we view as being unwarranted on this record and that, accordingly, must be reversed. See part 3.b, infra. To the extent that the bank may thus have liability as an assignee by virtue of the act, it would extend to "all affirmative claims and defenses with respect to the loan" that the plaintiffs could assert against the lender, including the statutory claims asserted under the Consumer Protection Act, G. L. c. 93A; and the Borrower's Interest Act, G. L. c. 183, § 28C, as well as the affirmative defense of unconscionability.

"Nothing in our decision in Fremont, however, was intended to suggest that the universe of predatory home loans is limited only to those meeting the four criteria present in that case. Rather, "[t]he holding of Fremont was that [G. L. c.] 93A prohibits 'the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay.' " Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51, 56 (1st Cir. 2011), quoting Fremont, supra at 748-749." Id. 465 Mass. 775 at 786.

44. certain home refinancing loans that are not in the borrower's interest. The statute provides:

(5)

"A lender shall not knowingly make a home loan if the home loan pays off all or part of an existing home loan that was consummated within the prior 60 months or other debt of the borrower, unless the refinancing is in the borrower's interest."

G. L. c. 183, § 28C (a). The statute also mandates that



"[t]he 'borrower's interest' standard shall be narrowly construed, and the burden is upon the lender to determine and to demonstrate that the refinancing is in the borrower's interest." 465 Mass 775 at 787 This 2008 mortgage was the much-discredited Wachovia Pick-A-Pay, with negative amortization

COUNT THREE

VIOLATIONS OF MASSACHUSETTS AND ATORNEY GENERAL REGULATIONS 940 CMR SECTIONS 7 AND 8 Regarding the Modification Process and Resolution of Mortgage Difficulties.

45. The Plaintiff reiterates and restates all of the facts in numbers 1- above.

46. As the affidavit shows, the plaintiff was taken for a ride for many years in this process. (see attached time line). First the Plaintiff was categorically told he had to fall behind even to qualify for a modification. As indicated this was a stated income mortgage.

47. Once the Plaintiff fell behind he began frantically applying for modification. He Many applications over a few short years for modification and for other mortgage Workouts. In no case was she treated fairly. Documents were lost, claimed not to be received over and over again. In fact in the dozens of modification and resolution attempts made by the Plaintiff, not one was completed by the Defendants.

48. The modification offered after many years was no solution as it had a balloon payment of over $150,000.

49. The solicitation of the Plaintiff, in bad faith, to fall behind on the se mortgage payments represents violation of the laws of consumer protection The implied and express promises that asolution to the mortgage issues can be determined by the numerous applications- both HAMP and post-HAMP can lead to a resolution of the mortgage difficulties all constitute unfair a deceptive acts under the previously mentioned sections of Massachusetts laws

--+-+

COUNT FIVE

Violation of Massachusetts General Laws c. 106 sect 3-301.,

50. One must be a holder in due course in order to have the right to collect the debt (here a mortgage) Massachusetts General Law Chapter 106 sect 3-302. Physical

possession of the note is required for a party to be a holder in due course. M.G.L. sc. 106 sect 1-201(20). Since the mortgage is the document that attaches the debt evidenced by the note to the property. Therefore both the mortgage and note must be attached at all times. On several different occasions requests to observe the original note.

No favorable response has been made regarding these requests as of this date.

51. A mortgage is security for a note or other obligation. Private Lending and Purchasing, Inc., v. First American Title Insurance Co., 54 Mass App Ct , 532 at 537. (1945). The mortgage (is) but incident to the debt. Perry v. Oliver 317 Mass. 538 (1945). The title held by the mortgagee cannot be separated from the note and applied independently of the note by the creditor of the mortgagee in payment of a debt of the latter, leaving the note outstanding as a valid obligation of the mortgagor to the holder of the note who might be a person other than the mortgagee. Coperstein v. Bogas, 317 Mass. 341 (1944).

52. Therefore, in order for a mortgage to have effect in Massachusetts, the STATED holder of the mortgage must also have the note. M.G.L. c. 106 sect. 1-201 (20), the holder must be in possession of the note.

Citizens's may not have possession of the note should be required to produce said note.

Furthermore, under Article 3 of the Massachusetts U.C.C section 2:

<u>53. 88. 2(a) Foreclosing lender must have physical possession of the original promissory note.</u>

The lender may try to rely on a purported certified or attested copy of the promissory note, but the Massachusetts Uniform Commercial Code (UCC) requires that "holder" of a mortgage must also be in possession of the original note, and therefore able to produce it for inspection.[8] Consistent with the UCC definition of a holder is the UCC requirement that a valid assignment requires physical transfer of the note.

<u>54. 2(d) Lender should produce original loan documents for inspection.</u>

In addition to the original promissory note and a complete chain of assignments of the note, the borrower should demand inspection of all original loan documents to see if any legally required papers are missing, or were forged, altered, or falsified by the lender. Original documents must be examined because with modern photocopying and scanning technology, alterations may not be detectable on copies.

" COUNT SIX

VIOLATIONS OF G.L. CHAPTER 244 SECTION 35 A, B AND C

55. During all of the years involved until the filing of the required affidavit, as shown by supporting documents, the Defendants lost, misplaced documents sent by the Plaintiff. The plaintiff made several applications for modification. Also, in most cases, the Defendants did not provide the Plaintiff with any of its calculations. Under Chapter 244 Section A, B and C, the Defendants were required to determine the borrowers (Plaintiff's) current ability to make an affordable monthly payment. Secondly, the lender Is required to identify a mortgage, loan that achieves the borrowers affordable monthly Payment: reduction in principle, reduction in interest rate, or an increase in amortization period. Finally the statute requires that the mortgage company conducts a comparative analysis comparing the new present value of the modified mortgage and the anticipated net recovery that would result from the foreclosure: Which would give the greater return to the investors. The results must be made available to the mortgagor (the plaintiff etc.).

56. The mortgage company is required to follow these and other related guidelines to see what the homeowner can and cannot afford. The Net Present Value (NPV) is a complicated series of calculations that must be done and there must be transparency. The calculations must be made available and given to the homeowner (Plaintiff). They were not given to the Plaintiff.

57. As the records attached shows the Plaintiff was not effectively assisted in the modification efforts. For years application were lost or mislaid. Information already supplied was asked for over and over again.

For these reasons Citizen's stands in violation of the above named statutes and any affidavit (not yet filed) claiming that "reasonable steps were taken to avoid foreclosure would be patently false.

58. Violation of MGL Chapter 244 section 35(B). Despite the second mortgage status of this agreement, it was an adjustable rate mortgage with an initial rate. This loan was a stated income loan, which required no documentation.

If they sell the property in foreclosure the first mortgage will probably still be attached, which makes the property useless to a new owner.

And, as indicated before the Net Present Value was not done here at all.57. Violation of MGL Ch 244 sector 35 ©. Many efforts to scuttle modification

59. Defendant has yet to produce the original note for inspection. And, they certainly did not locate a modified mortgage payment that would achieve the goals stated in C. furthermore, as of 2017 the first mortgage was modified. Therefore, the excuse used no longer carried any weight. There was no reason for the second mortgage not to be modified or at least seriously attempted before foreclosure took place

60. When this mortgage was finally modified, it was done with a large balloon payment which does not correct the unfair and deceptive nature of the of the original mortgage

61. As a recent court noted See: In re Cruz: Adv. Pro NO: 11-4006

"Massachusetts Courts have consistently held that in addition to complying with the statutory requirements governing mortgage foreclosure set forth in Mass. Gen Laws Ch. 244, a mortgagee must act in good faith and must use reasonable diligence to protect the interests of the mortgagor. Williams v. Resolution GGF OY, 417 Mass. 377, 382-83 (1949). In Snowden v. Chase Manhattan Mortgage Corp., 2003 WL 22519518 (Mass. Super.), the court held that a lender breached this duty by foreclosing a mortgage the day after receiving notice that the borrower had negotiated an agreement to sell the property at a price beneficial to the lender. The court noted that mortgagees in Massachusetts must act as trustee for the benefit of all persons interested. Quoting Taylor v. Weingartner, 233 Mass 243, 247, (1916). The Plaintiff argues that by scheduling a foreclosure sale while the Plaintiff's loan modification request was pending, Deutsche breaches its duty to act in good faith and with reasonable diligence to protect the plaintiffs' interests. The plaintiff's argument finds support in Spelos, which concluded that even though the borrowers had failed to state a claim for relief under third party

beneficiary theory, they could state a claim for negligence on the theory that the Defendants had a duty under the HAMP guidelines not to proceed with a foreclosure sale while evaluating the borrowers for a loan modification. Spelos, 2010 WL 5174510 at

62. The plaintiffs allegation that Deutsche breached its duty of good faith and reasonable diligence is comparable to the negligence claim of Spelos. (Motion to dismiss denied on negligence theory).

63. MGL CH 244 Sections B and C directly relate to the power of sale by foreclosure and as such they are not only part of the foreclosure process but a necessary prerequisite for the sale of real estate in foreclosure in Massachusetts

Clearly Citizen's intends to foreclose than to modify.

64. In U.S Bank National Association v. Schumacher, 467 Mass. 421 (2014)., the court specifically indicated that MGL sections 35 B and C create requirements to be able to advertise a foreclosure auction. The ruling came too late to have been considered for the statutes. However, the statutes are clear that they are PREREQUISITES for advertising foreclosure by sale in Massachusetts

IMPROPER ASSIGNMENTS AND IMPROPER TRUST ARANGEMENTS

65. J.P. MORGAN MORTGAGE ACQUISITION TRUST 2007-CH5 Was not on the original SEC website.

It stopped at 2007-CH3. From the depositor it says - J.P. MORGAN ACCEPTANCE CORPORATION I This trust got caught up in conversion from REMIC to business trusts.

66. Apparently, Chase was originally setting up their trusts as an traditional REMIC, but they too got the notices from SEC as to non-compliance. They then ceased the traditional REMIC format, and appear to have gone to a "Bond" business trust formation. A business trust is set up differently. It allows derivatives swaps to purchase out loans and buy other loans (REMICs precluded by certain rules). It acts a business trust for PROFIT which is not supposed to be done.

There are numerous ABS forms once found the trust. These ABS show repurchases, and compliance issue goes from 2007 to present date. We have no idea if this loan was swapped out or repurchased for

any cause. There is also no Mortgage Loan Purchase Agreement with attached Mortgage Schedule.

67. There is also an ISDA (International Swap and Derivatives Agreement). This allows swap out of default

loans. Servicer and NIMS (insurer) are allowed to purchase defaulted loans.. With a swap contract -- Chase would pay a monthly premium to a "debt buyer" to "stand by" to purchase defaulted loans. In addition, the ABS forms indicate that some repurchases may have been forced --- Chase would force the originator to repurchase any "bad" loan -- but, according to this trust - Chase was the originator – meaning they would repurchase -- and then sell to a debt buyer. We simply do not know. Was there any modification involved? Also, certain "classes" were privately placed - and not sold to security underwriter - also Chase itself.

68. The odd thing about this trust is that the trustee, Deutsche, does not physically hold the loan documents.

With a REMIC - the trustee holds. As REMIC is a traditional trust. But a business trust is different. Trustee role is not relevant. This trust says that the documents are held by the custodian -- which is JPMorgan Chase Bank, N.A., who is also the Master Servicer (See attached excerpts from the Prospectus). So if Deutsche is claiming to "hold" the docs, they do not. Conveyance implies that the trustee is legal holder, but this is not the case as to physical possession, and not necessarily the case for a business trust. I do not see the business trust registered in Delaware -- the Depositor registered. But it could be in NY..

69. There is also another trustee –

but only for Trust Oversight. - PENTALPHA SURVEILLANCE LLC

Trust Oversight Manager JPMorgan was first BANK,to dispose of the "toxic" mortgages as they call them.

70. It extremely doubtful that this loan is still in any trust - or with Chase. Chase is very powerful. It means that Deutsche Bank did NOT hold the note unless they received transfer from servicer/custodian. Custodian JPMorgan Chase (also servicer) had possession of the note. Now, the custodian could have sent the note to Deutsche Bank, but there is no proof of that. Most likely, the servicer (also custodian) held the docs. Since this Trust was converted from a REMIC to business trust – the servicer could hold for the trust. Note that conversions will include the word "BOND." Still they have

not proved that. But, if they do, Deutsche is then not the legal holder. Can't have it both ways. Either there is a fiduciary holder (REMIC) or a business trust and the trustee is not the legal holder. We don't know if Docs ever went to Deutsche. There needs to be authority to transfer from servicer/custodian to trustee and vice-versa.

71. Balloon payments were negated for modifications -(I believe) by National Mortgage Settlement. Remember too - if business trust - they operate as business -- buying and selling loans for profit. Well, this has been a long time. What has happened since beginning? Usually, mods REMOVE from trusts – especially if a balloon loan.

Besides the fact that the trust was improper under both state and federal laws, it also shows that Deutsche cannot possibly have the note. Finally, it shows that balloon payments represent IMPROPER policy in modifications.

## PRAYER FOR RELIEF

WHEREFORE, The Plaintiff respectfully requests the following relief:

A Enjoin Deutsche Bank National Trust or any other entity from foreclosing on the property at 122 Battles St, Brockton, MA 02301

B. requiring that ANY entity be required to produce the original note properly assigned to establish their collection and/or foreclosure rights under the mortgage. As a substitute an affidavit probing that they are operating as the agent of such an entity is required.

C. Enter a judgment declaring that the acts and practices of the Defendants complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing.

D. Order the Defendants not to interfere with the use, occupancy and enjoyment of the property at 122 Battles Street, Brockton, MA

E. Grant a permanent and final injunction enjoining the Defendants and agents employees, affiliates and subsidiaries from continuing to harm the Plaintiff.

F. Order specific performance of Defendant's contractual obligations together with other relief required by law and contract and law.

(15)

G. Award actual and punitive damages to the plaintiff.

H. Award the Plaintiff the costs of this action, including the fees and costs of any experts called, together with reasonable attorney's fees. Also, repay Plaintiff all monies paid to Defendant.

J. Grant Plaintiff such and other and further relief as this Court finds necessary and proper.

VERIFIED DECLARATION

I, Maria R. Santosdeclare as follows:

1. I am the owner of the property located at 106 Polaris Drive, Mashpee, MA. I am also the mortgagor regarding the mortgage held by Deutsche Bank National Association. I am also the plaintiff in this lawsuit

2. I have personal knowledge of the issues concerning RBS citizens, including those set out in the foregoing Complaint, and if called upon to testify I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury that the fact set forth in this complaint are true to the best of my knowledge and that all of the assertions are true and correct.

Signed under the pains and penalties of perjury

Maria Santos

Maria R. Santos

DATED ~~June 2020~~ August 10, 2020 MRS

For the Plaintiff, Maria R. Santos
By ~~Her~~ attorney

Robert k. Cabana BBO 641885
1354 Hancock Street, Suite 206
Quincy, MA 02169
Tel no 617-405-4283
E-mail: Rkc6068@aol.com

**AFFIDAVIT CONCERNING PURPORTED SIGNATURE OF MARIA SANTOS**

**Affected Premises: 122 Battles Street, Brockton, MA 02301**

I, Jean Mitchell, of 220 Lancaster Rd. Berlin MA 01503; being duly sworn, do hereby depose and swear of my own free will, as follows:

1. I am a Document Examiner and Digital Evidence Handling Expert, specializing in Questioned Document Examination (QDE). In forensic science, QDE is the examination, using scientific processes and methods, of documents whose authenticity may be disputed in a court of law, or otherwise, to provide evidence of whether the document might be suspicious or questionable.

   Questioned document examining also involves examining of handwriting and typescript to ascertain the source or authenticity of a questioned document. However, document examining is not restricted to a mere visual comparison of words and letters. As a document examiner, I must know how to use the techniques of microscopy photography and such analytical methods as criminology to uncover, successfully, all efforts both brazen and subtle, designed to change the content or meaning of a document.

   A Document Examiner uses knowledge that is gathered through years of training and experience to recognize and compare the individual characteristics of questioned and known authentic writings. The uniqueness of handwriting makes this type of physical evidence, like fingerprints, one of the few definitive characteristics (See Gilbert v. California) 338U.S.260(1967) the Supreme Court upheld, that "handwriting samples are identifying physical characteristics."

2. I have been a Document Examiner and Digital Evidence Handling Expert for more than 15 years. I have taught forensic science students at the college level, Anna Maria College ("Photo Manipulation for Criminal Justice and Counterfeiting"), as well as trained Massachusetts law enforcement officers in the fields of forgery, not limited to counterfeiting, e.g., currency, handwriting and signatures, along with drug packaging, medication, photo identification cards, casino chips, and digital evidence handling including chain of custody.

3. I have also provided expert testimony in numerous legal actions, heard at many levels, and in several areas of the judicial system. Some examples of my testimony are the following:
   - "Deutsche Bank v Wilder" (Worcester Housing Court, Docket #18H85SP003908), March 2019): Provided testimony concerning forgeries of signatures on the purported mortgage origination and recent versions of Note and the anti-counterfeit measure on documents (available since 1980's).
   - "Emigrant Mortgage Company Inc. v. Pinti" (Federal Court, Docket #16CV11136, January 6th, 2019) outcome in favor of my client Linda Pinti.
   - "Wells Fargo v Yuriy B. Mankovskiy" (April 2019 Settlement out of court) outcome in favor of my client Yuriy B. Mankovskiy.

- "Lehman Brothers v The Estate of Betty Lawson" (October 18th, 2018) Drafted and submitted a report directly to the U.S. Commissioner of HUD on suspected illegal foreclosure that appears to be perpetrated by HUD in Massachusetts.
- Testified about falsified documents seen in foreclosure cases to the Massachusetts Legislature's Joint Committee on the Judiciary (September 26, 2017)
- Testified about falsified documents seen in foreclosure cases to the Massachusetts Legislature's Joint Committee on the Judiciary (July 30, 2019).

(**Disclaimer:** The author of this report is not responsible for how it is used. This report is protected under all U.S. and international Copyright protections 8/6/2019)

**This is a report for Maria Santos concerning what purports to be her signature**

4. This is a report for Maria Santos, concerning a signature on a purported note for property located at 122 Battles Street, Brockton, MA 02301, as shown in the deed dated March 7, 2007 and recorded at Plymouth County Registry of Deeds book # 22517 page # 222.

5. On July 30th, 2019 at 10:00 A.M. I met Maria Santos along with her son John Santos, and their attorney of record Robert Cabanna Esq., at Harmon Law Offices P.C., 150 California St. Newton MA 02458 to examine a signature appearing on a purported Note dated March 7th, 2207.

6. I engaged in what are known as "Best Collection Techniques" when obtaining Ms. Santos' writing samples and signature:

   A. I use known writings furnished to me as similar as possible to the questioned document.

   B. I make sure that the writing implemented, and paper used by the client is as similar as possible as the questioned document. Styles and habits may be somewhat altered when a person switches from a ballpoint or a fountain pen

   C. I seek the known writings containing some of the words and combinations present in the questioned document.

   D. I ensure that exemplars are adequate in number to show a range of natural variations and that the age of the exemplars, be as close as possible to the document in question.

   E. I engage the following steps to prevent deception or nervousness to ensure valid comparisons.

F. I arrange that the writer should be comfortably seated at a desk or table free of distraction.

G. I never show the questioned document nor tell the writer to spell certain words or what punctuation to use in the exemplar being written.

H. I ensure the writer is given paper like those used in the questioned document. Lined and unlined paper may also affect the handwriting especially if they are accustomed to one type or another.

I. In procuring handwriting exemplars, I never tell the writer whether to use uppercase or lowercase lettering.

J. I have the text written three times to prevent attempts to disguise the writing. If noticeable variations appear, I seek additional repetitive dictation as required from the writer.

K. I seek signature exemplars that are obtained when combined with other writings such as checks or receipts.

7. Maria Santos provided me with the following reference documents:

Massachusetts Driver's License of Maria Santos
(True photocopy appended as Exhibit A)

What purports to be a copy of an Adjustable Rate Note, payable to Chase Bank U.S.A, N.A. for a Note dated March 7th, 2007.; and sent 2018 from Deutsche Bank National Trust Company to Maria Santos.
(True photocopy appended as Exhibit B.)

Copy of the signature page of Maria Santos Tax Return
(True photocopy appended as Exhibit C)

Copy of an affidavit of Maria Santos
(True photocopy appended as Exhibit D)

8. Harmon Law Offices PC refused to provide the requested document custodian information for the chain of custody for the purported wet ink document that was shown. The R.E.S.P.A Qualified Written Request, a part of the "Real Estate Settlement Procedures Act, 12 U.S. C. 2605(e) and "Subtitle E Mortgage Servicing" of the Dodd-Frank Wall Street reform and Consumer Protection Act Section 2605(e)(1)(A) and Reg. 940 C.M.R, Section 3500.21(e)(1).

These documents, along with additional documents below, were also requested in the "Demand to see the Mortgage Note." More specifically, the attorneys from Harmon Law Offices PC did not provide any of the following:

In the Demand to see the Mortgage Note; the "Full name, address, and telephone number of the Custodian of my original Promissory Note, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f)(2) of the Truth in Lending Act."

In the Demand to see the Mortgage Note; the "Full name, address, and telephone number of the Custodian of my original Security Instrument, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f)(2) of the Truth in Lending Act.

In the Demand to see the Mortgage Note; "A physical location (address) of the original promissory note, original security instrument, and all assignments of the security instrument, and a contact name and phone number of someone who can arrange for inspection of said documents.

9. The actions of the Harmon Law Offices P.C Attorneys appear to be consistent with a violation of:

   **Massachusetts Bar Association Code of Conduct 4.1** that states "Rules of Professional Conduct Rule 4.1: Truthfulness in statements to others." It goes on to define the conduct as the following: "In the course of representing a client a lawyer shall not knowingly:

   **(a)** make a false statement of material fact or law to a third person; or
   **(b)** fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited."

## ANALYSIS

10. When the original Note lacks enough space for all the indorsements of the Note to successor payees, an Allonge to the Note document may be attached. One Allonge was attached to the copy of the purported wet ink, however the endorsements appear to be from Chase Bank USA NA to Deutsche Bank Trust Company, acting as a Trustee for J.P. Morgan Mortgage Acquisition Trust.

## ANALYSIS, OF PURPORTED SIGNATURE

11. Ms. Santo's signature did not contain any evidence of pressure variation nor burr striations. This is a variation of light and dark ink that naturally occurs as the hand applies more pressure to start a letter and less pressure as the hand finishes the letter. The purported signature of Ms. Santos appears solid in color and the strokes of the writing instrument do not clearly darken where one stroke crosses over another.

12. No pressure marks are visible, even when the purported signature was enlarged 1,000%. This is inconsistent with any manual writing instrument being used. Variations in the coloring of ink were also not visible and is inconsistent with a standard writing instrument.

13. The purported signature also was missing rest marks. These are where the ink pools when the pen stops each time the hand prepares for the next stroke. Lack of rest marks is inconsistent with human writing and is consistent with an electronically placed image.

    **Exhibit #1**

14. The purported signature is inconsistent with ink and inconsistent with being written by a human hand. This is inconsistent with the Uniform Commercial Code ARTICLE 3: PART 3; 3-308 PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE. Under the Uniform Commercial code, all endorsement signatures on a nonnegotiable instrument must be signed in ink.

15. The signature of Ms. Santos on the Purported Note shows the "i" in Maria appears to be in an inconsistent style of writing compared to the known samples. Ms. Santos appears to make her lower case "i" look like a separate printed lower case "i'. The lower case "i" on the copy of the purported note appears to look like a printed lower case "e" and is inconsistent with the normal variation of hand. Furthermore, the lower case "o" in Santos is always not attached to the other letters. The lower case "o" on the copy of the purported note clearly is connected to the "t" that appears before it.

16. On the Massachusetts Driver's License of Maria Santos, the signature is inconsistent with the signature appearing on the copy of the purported Note. The lower case "a" on the copy of the purported Note appear to be a closed character and the lower case "a" are open at the top right on known signature samples and appear consistent with being outside of the normal variation of hand.
    **Exhibit #2**
    (Copy of Driver's License, Exhibit A-D)

17. The black ink of the signature appears to have crystals visible in the solid black areas. This is inconsistent with "Wet Ink". Ms. Santo's signature appears to be consistent with the "image" of a signature being electronically placed on the document. Digital reproduction equipment uses a combination of Graphite and Oil along with heat to affix an image to a surface.
**Exhibit #3**

18. This is inconsistent with the Uniform Commercial Code ARTICLE 3: PART 3; 3-308 PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE. Under the code all endorsement signatures on a nonnegotiable instrument must be signed in ink.

19. In the State of Massachusetts; the evidence is consistent with the Note appearing to be criminally "Uttered" by Deutsche Bank National Trust Co., and its agents. It is further consistent, with what appears to be a violation of Chapter 267 Section 5 in the Massachusetts Chain of Title Law: FORGERY AND CRIMES AGAINST THE CURRENCY[1], also Uniform Commercial Code ARTICLE 3: PART 3; 3-308 PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE. Uniform Commercial Code ARTICLE 3: PART 3; 3-309. ENFORCEMENT OF LOST, DESTROYED, OR STOLEN INSTRUMENT[2], Code ARTICLE 3: PART 3; 3-401(A) only allows debt collection against the signer of the instrument.

20. Maria Santos is not the signer of this instrument. By plain language of this law, the instrument is inconsistent and would appear invalid for debt collection against Maria Santos.

**COURT HISTORY AND ADMISSIONS BY DEUTSCHE BANK N.A.**

DEUTSCHE BANK NATIONAL TRUST COMPANY, trustee, [Note 1] vs. FITCHBURG CAPITAL, LLC, & others. [Note 2] 471 Mass. 248

January 5, 2015 - April 15, 2015; Court Below: Land Court. Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ. **Records And Briefs:**

- (1) SJC-11756 01 Appellant Fitchburg Capital LLC Brief
- (2) SJC-11756 04 Appellee Deutsche Bank Brief

---

[1] Section 5: UTTERING false or forged records, deeds or other writings. Section 5 of Chapter 267 of the Massachusetts Chain of Title Law clearly States that "Whoever, with intent to injure or defraud, utters and publishes as true a false, forged or altered record, deed, instrument or other writing mentioned in the four preceding sections, knowing the same to be false, forged or altered, shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years"

[2] Uniform Commercial Code: Article 3-308: PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE also, Article 3-309: ENFORCEMENT OF LOST, DESTROYED, OR STOLEN INSTRUMENT

- (3) SJC-11756 05 Amicus REBA Brief

Oral Arguments

Mortgage, Real estate, Discharge, Foreclosure, Dragnet clause. Real Property, Mortgage. Limitations, Statute of. Practice, Civil, Summary judgment, Statute of limitations. Statute, Retroactive application, Construction. Due Process of Law, Retroactive application of statute, Statute of limitations. Constitutional Law, Contract clause.

Discussion of the statutory background of G. L. c. 260, § 33, the "obsolete mortgage" statute. [251-252]

A Land Court judge properly concluded that, under the "obsolete mortgage" statute, G. L. c. 260, § 33, although two mortgages did not expressly contain the terms or maturity dates of the mortgages themselves, the dates and terms of the underlying debts set forth in the mortgages were statements of the terms or maturity dates of the mortgages themselves and thereby made the mortgages subject to the statute's five-year limitations period; accordingly, a mortgagee's purported foreclosure of the property securing the mortgages was null and void, given that the mortgages had been discharged as a matter of law prior to the foreclosure [253-258]; further, this court concluded that retroactive application of the limitations period in the statute, as amended by St. 2006, c. 63, § 6 (act), to the mortgages did not violate due process and contracts clause protections under the Massachusetts and Federal Constitutions, in that the period of five and one-half months provided by the Legislature between approval of the act and the effective date of the operative section was reasonable in light of the fact that a mortgagee was provided options under the statute other than commencing foreclosure to extend its rights under a mortgage [258-260].

CIVIL ACTION commenced in the Land Court Department on July 2, 2012.

A motion for partial summary judgment was heard by Robert B. Foster, J., and entry of separate and final judgment was ordered by him.

Page 249

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Jeffrey T. Angley (Robert K. Hopkins with him) for Fitchburg Capital, LLC.

Jeffrey B. Loeb for the plaintiff.

Thomas O. Moriarty, for Real Estate Bar Association for Massachusetts, Inc., & another, amici curiae, submitted a brief.

Philip F. Coppinger, for Ry-Co International, Ltd., amicus curiae, submitted a brief.

---

**HINES, J.** Under a 2006 amendment to the so-called "obsolete mortgage" statute, a mortgage becomes unenforceable after a certain number of years: a mortgage in which the term or maturity date is stated becomes unenforceable five years after the expiration of the term and a mortgage in which the term or maturity date is not stated becomes unenforceable thirty-five years after recording. [Note 3] G. L. c. 260, § 33, as amended by St. 2006, c. 63, § 6. The defendant Fitchburg Capital, LLC (Fitchburg), foreclosed on two mortgages at a time when both mortgages would be unenforceable under the amended statute if the five-year statute of limitations was applicable. In this appeal, we interpret the amended statute to determine whether a mortgage stating only the term or maturity date of the underlying debt is a "mortgage in which the term or maturity date of the mortgage is stated" under G. L. c. 260, § 33, and whether the retroactive application of § 33 to mortgages recorded before the effective date of the amendment is constitutional.

The plaintiff, Deutsche Bank National Trust Company, as trustee of Ameriquest Mortgage Securities, Inc., Asset-backed Pass-through Certificates, Series 2004-R11 under the Pooling and Servicing Agreement dated as of December 1, 2004 (Deutsche Bank), filed a motion for partial summary judgment seeking a declaration that the mortgages are discharged under the obsolete mortgage statute and the foreclosure auction conducted on the property securing those mortgages is null and void. [Note 4] In a well-reasoned opinion, a Land Court judge granted partial summary

Page 250

judgment for Deutsche Bank, concluding that reference in the mortgages to the term of the underlying debt was sufficient to state the "term or maturity date of the mortgage"; that the mortgages became obsolete pursuant to G. L. c. 260, § 33; and, therefore, that the foreclosure sale conducted by Fitchburg was null and void. The judge rejected Fitchburg's constitutional challenge to the statute. We transferred Fitchburg's appeal to this court on our own motion and now affirm. [Note 5]

21. It would appear that the purported Mortgage for 122 Battles Street in Brockton is also consistent with being "Obsolete" under the above stated decision awarding Deutsche Bank discharge from Fitchburg.

**Why Deutsche Bank Can't Just Shake Off Its Problems**

By Steven Arons, October 24th, 2018 Bloom Berg Business Week: *The U.S. Federal Reserve has placed the lender on its list of troubled banks. And its U.S. unit was the only bank to fail the Fed's annual stress measuring the adequacy of capital and risk controls, pushing back the day when shareholders will see any upside from its biggest foreign operation.*

22. In summary, due to several abnormalities present in the purported signature on the copy of the purported note, it is the opinion of this examiner that this note is consistent with a fabrication because:
    A. The purported signature of Maria Santos is not original and appears to be consistent with being artificially placed upon the document with what appears to be consistent with the intent to deceive.

23. This appears to be consistent with making the note invalid in the State of Massachusetts; the evidence appears consistent with the note being criminally "Uttered" by Wells Fargo Home Mortgage and its agents, This appears to be a violation of Chapter 267 Section 5 in the Massachusetts Chain of Title Law: FORGERY AND CRIMES AGAINST THE CURRENCY[3], also Uniform Commercial Code ARTICLE 3: PART 3; 3-308 PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE. Uniform Commercial Code ARTICLE 3: PART 3; 3-309. ENFORCEMENT OF LOST, DESTROYED, OR STOLEN INNSTRUMENT[4], Code ARTICLE 3: PART 3; 3-401(A) only allows debt collection against the signer of the instrument. Maria Santos is not the

---

[3] Section 5: UTTERING false or forged records, deeds or other writings. Section 5 of Chapter 267 of the Massachusetts Chain of Title Law clearly States that "Whoever, with intent to injure or defraud, utters and publishes as true a false, forged or altered record, deed, instrument or other writing mentioned in the four preceding sections, knowing the same to be false, forged or altered, shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years

[4] Uniform Commercial Code: Article 3-308.PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE also Article 3-309: ENFORCEMENT OF LOST, DESTROYED, OR STOLEN INSTRUMENT

Exhibit A

Massachusetts Driver's License of Maria Santos





Enlargement for signature from driver's License

Exhibit B

What purports to be a copy of the original Adjustable Rate Note, payable to Chase Bank N.A for a Note dated March 7th, 2007.; and sent 2018 from Deutsche Bank National Trust to Maria Santos.

True copy attached

Exhibit C

Sample from the Tax Return of Maria Santos

ertify that I have the authority to execute Form 4506-T on behalf of the taxpay
ceived within 120 days of the signature date.

Signatory attests that he/she has read the attestation clause and upon so
has the authority to sign the Form 4506-T. See instructions.

Maria R Santos

Signature (see instructions)

Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature

atory attests that he/she ha
he authority to sign the Form 4506-T. See instructions.

Maria R Santos

Signature (see instructions)

Exhibit D

Signature sample from Affidavit of Maria Santos



**Exhibit #1**

Ms. Santo's signature did not contain any evidence of pressure variation nor burr striations. This is a variation of light and dark ink that naturally occurs as the hand applies more pressure to start a letter and less pressure as the hand finishes the letter. The purported signature of Ms. Santos appears solid in color and the strokes of the writing instrument do not clearly darken where one stroke crosses over another.






Machine code consistent with an electronic reproductive device.

**Exhibit #2**

Signature of Ms. Santos on the copy of the purported document. The signature has the "i" in Maria is clearly a different style of writing. Ms. Santos makes her lower case "i" lie a separate printed lower case "i'. The lower case "i" on the copy of the purported note clearly looks like a printed lower case "e" and is outside of the normal variation of hand. Furthermore, the lower case "o" in Santos is always not attached to the other letters. The lower case "o" on the copy of the purported note clearly is connected to the "t" that appears before it.

On the Massachusetts Driver's License of Maria Santos, the signature does not match the signature appearing on the copy of the purported document. All the lower case "a" on the copy of the purported note are a closed character and the purported signature all the lower case "a" are open at the top right and outside of the normal variation of hand.

Signature appearing on the purported note




Known sample of Ms. Santos signature on her Massachusetts driver's license.




Known sample of Ms. Santos signature on her tax return.

Signatory
has the authority to sign the Form 4506-T. See instructions.
Signature (see instructions)

Known sample of Ms. Santos signature on her tax return.




**Exhibit #3**

The blue ink of the signature appears to have magenta visible on the edges of the blue. This is inconsistent with "Wet Ink". Ms. Santo's signature and is consistent with the "image" of a signature being electronically placed on the document. Color digital reproduction equipment uses a combination of four colors to create all the colors in the spectrum. These colors are: Cyan blue, Magenta red, Yellow and Black.



Magnified purported signature of Maria Santos the reflective particles are visible Particles, used in Toner



Known sample of ink from a pen. No reflective flakes present.

**Exhibit #4**

Machine code consistent with an electronic reproductive device.





# ADJUSTABLE RATE NOTE

(LIBOR Index-Rate Caps)

REDACTED



THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

March 07, 2007 — Date
LINCOLN, RI — City, State
122 BATTLES ST, Brockton, MA 02301 — Property Address

**1. BORROWER'S PROMISE TO PAY**

In return for a loan I have received, I promise to pay U.S. $ 336,000.00 Three Hundred Thirty-Six Thousand and 00/100ths (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Chase Bank USA, N.A.

a National Association organized and existing under the laws of United States
I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of Seven and 750/1000
7.750 %.

The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the 1st day of each month beginning on May 01, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 01, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 300 Tice Boulevard, 3rd Floor North Woodcliff Lake, NJ 07677 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payment**

Each of my initial monthly payments will be in the amount of U.S. $ 2,407.15 Two Thousand Four Hundred Seven and 15/100ths
This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the 1st day of April, 2010 and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

MS

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 000/1000 percentage points (6.000 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than Ten and 750/1000 10.750 %. or less than Seven and 750/1000 7.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one and a half percentage points (1.5%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than Fourteen and 750/1000 14.750 %. and will never be lower than Seven and 750/1000 7.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The Notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments** See Attached Rider

If the Note Holder has not received the full amount of any monthly payment by the end of XX calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be XX % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to so do if I am in default at a later time.

M.S

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Maria R Santos 5-3-07

| | |
|---|---|
| Borrower MARIA R SANTOS Date | Borrower Date |
| Borrower Date | Borrower Date |
| Borrower Date | Borrower Date |
| Borrower Date | Borrower Date |

WITNESS: [signature]
JOHN A. BERETTA

Loan Number: [redacted]

# LATE CHARGE RIDER TO NOTE

This LATE CHARGE RIDER TO NOTE amends that certain Note dated March 07, 2007 and executed by MARIA R SANTOS

("Borrower(s)") in connection with a loan made by
Chase Bank USA, N.A.
("Lender"). This LATE CHARGE RIDER TO NOTE, which is executed as of the same date as the Note, is made a part of the Note. All defined terms have the same meaning as defined in the Note.

A. Section 6a if Fixed Rate Note or Section 7a if Adjustable Rate Note ("LATE CHARGE FOR OVERDUE PAYMENTS") is deleted and replaced in its entirety by the following:

**If the Note Holder has not received the full amount of any monthly payment within 10 days of the payment due date shown on the monthly payment notice, I will pay a late charge to the Note Holder. The amount of the charge will be the greater of 6.000 % of my overdue payment of principal and interest or $29.00 . I will pay this late charge promptly but only once on each late payment.**

B. Except for the changes set forth in the LATE CHARGE FOR OVERDUE PAYMENTS, all terms of the Note remain in full force and effect.

WITNESS the Hand(s) and Seal(s) of the Undersigned.

Maria R Santos 3-7-07

| | |
|---|---|
| Borrower Date<br>MARIA R SANTOS | Borrower Date |
| Borrower Date | Borrower Date |
| Borrower Date | Borrower Date |
| Borrower Date | Borrower Date |





Borrower(s): SANTOS, MARIA
122 BATTLES ST
BROCKTON, MA 02301

Loan Amount: $336,000.00
Loan #:
Note Date: 3/7/2007

PAY TO THE ORDER OF:

Chase Home Finance, LLC

without recourse this 5/23/2007

Chase Bank USA, N.A.
a Delaware Corporation

A Young
Assistant Secretary

Allonge

Borrower(s): SANTOS, MARIA
122 BATTLES ST
BROCKTON, MA 02301

Loan Amount: $336,000.00
Loan #:
Note Date: 3/7/2007

PAY TO THE ORDER OF:

without recourse this 5/23/2007

Chase Home Finance, LLC
a Delaware Corporation

Angela Nolan
Assistant Vice President

24922

Received & Recorded
PLYMOUTH COUNTY
REGISTRY OF DEEDS
12 MAR 2007 03:06PM
JOHN R.BUCKLEY, JR.
REGISTER
Bk 34230 Pg 2-24

Return To:

John A. Beretta, Esq.
650 Washington Highway
Lincoln, RI 02865

00

Prepared By:
Thompson, Kerry

REDACTED

[Space Above This Line For Recording Data]

# MORTGAGE

Property Address: 122 Battles Street, Brockton, MA 02301

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 07, 2007 together with all Riders to this document.
(B) "Borrower" is MARIA R SANTOS

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Chase Bank USA, N.A.

Lender is a National Association
organized and existing under the laws of United States

Investor Loan #[redacted]

DIGIMAIL SEP 12 2013

## HOME AFFORDABLE MODIFICATION AGREEMENT
### (Step Two of Two-Step Documentation Process)

Borrower ("I"):1 **MARIA R SANTOS**
Lender or Servicer ("Lender"): **Select Portfolio Servicing, Inc.**
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): **March 7, 2007**
Loan Number[redacted]
Property Address [and Legal Description if recordation is necessary] ("Property"):

**122 BATTLES ST**
**BROCKTON, MA 02301**

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied.

1. **My Representations and Covenants**. I certify, represent to Lender, covenant and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents or default is imminent, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B. One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned;

   C. There has been no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

   D. I have provided documentation for **all** income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

   E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

   F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

   G. I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2. **Acknowledgements and Preconditions to Modification**. I understand and acknowledge that:

   A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

   B. I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification**. If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on **October 1, 2016** (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on **October 1, 2016**.

A. The Maturity Date will be: **May 1, 2037**.

B. The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, Unpaid Amounts) less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be **$303,211.37** (the "New Principal Balance"). The New Principal Balance will consist of two (2) parts: (i) an amount which will accrue interest at the Note rate shown below, and on my monthly statement as Interest Bearing Principal Balance and (ii) an amount which will not accrue interest, shown below, and on my monthly statement as Deferred Principal Balance.

C. **$957.63** of the New Principal Balance shall be deferred (the Deferred Principal Balance) and I will not pay interest or make monthly payments on this amount. The new Principal Balance less the Deferred Principal Balance shall be referred to as the Interest Bearing Principal Balance and this amount is **$302,253.74**. Interest at the rate of **3.125%** will begin to accrue on the Interest Bearing Principal Balance as of **September 1, 2016** and the first new monthly payment on the Interest Bearing Principal Balance will be due on **October 1, 2016**. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1-21 | 3.125% | 09/01/2016 | $1,166.32 | $619.55, may adjust periodically | $1,785.87, may adjust periodically | 10/01/2016 | 248 |
| **A final balloon payment on the Interest Bearing Principal Balance of $170,330.86 is due on the Maturity Date.** | | | | | | | |

The Deferred Principal Balance of **$957.63** will be due as a balloon payment on the earlier of, payoff of the Interest Bearing Principal Balance, transfer of the property or on the Modified Maturity Date. The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.
*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified Loan will be the minimum payment that will be due each month for the remaining term of the Loan. My modified Loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E. If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F. I agree to pay in full the Deferred Principal Balance less any Deferred Principal Reduction Amount to which I am entitled, and any other amounts still owned under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

G. If I make a partial prepayment of Principal, the Lender may apply that partial prepayment first to any Deferred Principal Balance before applying such partial prepayment to other amounts due.

4. **Additional Agreements.** I agree to the following:

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B. That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or other Workout Plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. **Funds for Escrow Items**. I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E. That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that either a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, 888-679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Agreement by Lender to (i) the U.S. Department of the Treasury, (ii) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (iii) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (iv) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (v) any HUD certified housing counselor.

N. That if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

**BALLOON NOTICE.** In order to reach an affordable payment, we extended your amortization term, which is the rate or speed by which your mortgage is calculated to be paid off; however, your maturity term, which is the period of time until your mortgage becomes due and payable, could not be fully extended to an equal term. This is because the investor on your account allows us to change your amortization term but does not allow us to change the maturity term to match. As a result of the difference between these two periods, there will be an amount due $170,330.86 on the date your lien matures on May 1, 2037. The amount due at maturity is in addition to your monthly scheduled payment and the principal forbearance of $957.63 that you received as part of your modification.

Maria R. Santos ____________________ 9-6-16
MARIA R. SANTOS - Borrower Date

BORROWER ACKNOWLEDGEMENT

State of Massachusetts
County Plymouth
On the 6th day of August 2016 (year) before me the undersigned, personally appeared

MARIA R. SANTOS

**Personally known to me or provided to me on the basis of satisfactory evidence to be the individual whose names (s) is/are subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.**

CLARISSE ANDRADE
MY COMMISSION EXPIRES JANUARY 16, 2020
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS

____________________ (Seal)
Notary Public

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3157 3/09 (rev. 10/10)**